IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>Plaintiff, )<br><br>v. )<br><br>STATE OF MICHIGAN AND )<br>MICHIGAN DEPARTMENT OF )<br>CORRECTIONS, )<br><br>Defendants. )<br> ) | Civil No. 2:16-cv-12146<br><br>Paul D. Borman<br>United States District Judge |

## OPINION AND ORDER GRANTING JOINT MOTION FOR FINAL APPROVAL OF THE SETTLEMENT AGREEMENT AND RESPONSES TO OBJECTIONS (ECF NO. 93)

Plaintiff United States of America commenced this action against Defendants

State of Michigan and Michigan Department of Corrections (collectively, the

"Parties"), alleging that the Defendants engaged in two discriminatory employment

practices in violation of Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. § 2000e, *et seq*. After engaging in extensive formal discovery and lengthy

settlement negotiations, the Parties reached a settlement. On February 22, 2021, the

Court granted the Parties' Joint Motion for Provisional Entry of the Settlement

Agreement and to Schedule a Fairness Hearing (ECF No. 91), and scheduled a

1

fairness hearing for Wednesday, June 2, 2021 at 10:00 a.m. The Parties notified Potential Claimants and other potentially affected individuals of the terms of the Settlement Agreement. Following notice, 39 objections to the Settlement Agreement were received by the Parties and filed with the Court. Fifteen of those objectors requested to speak at the Fairness Hearing, and ten of those fifteen objectors appeared and addressed the Court at the June 2, 2021 Fairness Hearing.

Now before the Court is the Parties' Joint Motion for Final Approval of the Settlement Agreement and Responses to Objections. (ECF No. 93, Joint Mot. Final Approv.) The Court conducted a Final Fairness Hearing using Zoom videoconference technology on Wednesday, June 2, 2021, at which counsel for Plaintiff and Defendants appeared and spoke. The Court further heard testimony from ten objectors to the proposed Settlement Agreement.

Having considered the written submissions and the oral presentations to the Court at the Final Fairness Hearing on June 2, 2021, the Court GRANTS the Parties' Joint Motion for Final Approval of the Settlement Agreement.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff United States of America ("United States") commenced this action against Defendants State of Michigan and Michigan Department of Corrections ("MDOC") on June 13, 2016, under Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII"), and filed an amended complaint on July 27, 2016. (ECF No. 6, Amended Complaint.) The Amended Complaint alleges that Defendants engaged in two discriminatory employment practices, in violation of Sections 703(a), 706, and 707 of Title VII, 42 U.S.C. §§ 2000e-2(a), 2000e-5, 2000e-6:

(1) designation of four Non-Housing correctional officer ("CO") assignments (Food Service, Yard, Property Room, and Electronic Monitor) at Women's Huron Valley Correctional Facility ("WHV") as "female-only" positions; and

(2) transfer practices that prevented female COs from transferring from WHV on terms that were applicable to male COs.

(Amended Compl., PageID.40-44.)

According to the Amended Complaint, Defendant MDOC designated certain Non-Housing Unit CO assignments at WHV as "female-only" in 2009. (*Id.* PageID.35-36.) MDOC lifted the female-only designations for three of the challenged assignments in 2016, but the female-only designation remains on the Electronic Monitoring assignment. (*Id.* PageID.37.) Such a female-only designation is permitted by Title VII only if sex is a bona fide occupational qualification ("BFOQ") "reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e-2(e)(1).

3

Additionally, since at least 2009 to the present, MDOC has imposed a transfer freeze from WHV to other MDOC facilities. (Amended Compl., PageID.38.) The United States alleges that the freeze applied only to female COs because some exceptions were made for males who wanted to transfer. (*Id.* PageID.39.)

The United States' case was based on charges of discrimination against Defendants that were timely filed with the Equal Employment Opportunity Commission ("EEOC") by 28 Charging Parties. (*Id.* PageID.30-32.) The EEOC investigated the charges, found reasonable cause to believe that Title VII violations had occurred with respect to the 28 female COs and similarly situated individuals, and referred these charges to the United States Department of Justice ("DOJ") for possible litigation. (*Id.* PageID.32.) The United States DOJ notified Defendants of its intent to file a complaint against them for violating Title VII with respect to the allegations in the charges, including allegations of a pattern or practice of discrimination, and subsequently brought this lawsuit.

After more than a year of substantial litigation, including extensive fact and expert discovery, the Parties began productive settlement discussions in November 2017. These efforts culminated in a successful mediation on August 17, 2018, facilitated by Magistrate Judge Mona K. Majzoub. The Parties' Agreement

represents a balancing of the goals and interests of the Parties against the costs, uncertainties, and delays inherent in further contested litigation.

On February 18, 2021, the Parties submitted to the Court a Joint Motion for Provisional Entry of the Settlement Agreement and to Schedule a Fairness Hearing, attaching the [Proposed] Settlement Agreement. (ECF Nos. 90, 90-1.) The Parties acknowledged that their shared objective is to ensure that WHV is sufficiently staffed such that both inmates and staff are safe and secure in a manner that does not violate Title VII. The Settlement Agreement requires: (1) the development by MDOC of a system for reviewing female-only job assignments; (2) the lift of the WHV transfer freeze within fourteen days of WHV reaching a Vacancy Rate, as defined in the Agreement, between 9% and 14% for female COs; and, (3) the implementation of a written recruitment and retention plan for WHV. (See ECF No. 90-1, Settlement Agreement.) The Agreement also provides monetary relief in the amount of $750,000.00 to compensate female COs who were harmed by the transfer freeze at any time between 2009 and entry of the Agreement, as well as to provide Service Awards of either $5,000 or $10,000 to the 28 EEOC Charging Parties based on their assistance in bringing this case. In addition, MDOC will make 15 priority transfers of Claimants who still work as COs at WHV, as detailed in the Agreement. The Agreement sets forth a thorough process by which individuals who may be

affected by its terms were to be provided notice and the opportunity to object to the Agreement's final entry.[1]

The Court granted the Parties' Joint Motion for Provisional Entry of the Settlement Agreement on February 22, 2021, and set the Fairness Hearing for Wednesday, June 2, 2021 at 10:00 a.m. (ECF No. 91.) Following the Court's Order, the Parties sent notice of the proposed Settlement Agreement to every female individual who has worked as a CO at WHV since 2009. This notice included information on how to file objections to the Agreement with the Court prior to the Fairness Hearing, as well as instructions on how to file a claim for relief for a monetary award or priority transfer consideration and the *Interest-in-Relief Form* documents. The Charging Parties received the same notice and *Interest-in-Relief Form* documents, along with a Cover Letter to Charging Parties and a Notice of Service Award. Notice was also sent to all interested third parties, consisting of COs

---

[1] Following the Court's entry of the Settlement Agreement, all Charging Parties and Claimants will be notified, and the United States, in consultation with Defendants, will prepare and file the Proposed Individual Awards Lists with the Court, and move the Court to hold a Fairness Hearing on Individual Awards to review the initial individual award determinations as well as any objections to those initial determinations. Each of the Charging Parties and Claimants will be notified of the proposed monetary award she will receive and whether she is eligible for priority transfer, if she so requests. The Charging Parties and individuals who submitted *Interest-in-Relief Forms* will have the opportunity to object to the determinations of their eligibility for relief and their proposed individual awards, if any, and may request to be heard at the second fairness hearing.

currently employed at MDOC and the Michigan Corrections Organization, Service Employees International Union, Local 525M AFL-CIO, the union representing the MDOC COs, with instructions on how to file objections with the Court prior to the Fairness Hearing. Additionally, Defendants posted notice of the settlement on the State of Michigan and MDOC websites and on the MDOC intranet, as well as on the social media accounts of the State and MDOC, and in the Detroit News, Detroit Free Press, and MLive. Following notice, the Parties received 39 objections to the Settlement.

On May 24, 2021, the Parties filed their Joint Motion for Final Approval of the Settlement Agreement and Responses to Objections. (ECF No. 93, Joint Mot. Final Approval.) The Parties assert that the objections received by the Parties fall within seven categories: (1) Claimants other than Charging Parties should not receive individual relief; (2) the individual relief is insufficient; (3) the injunctive relief should include additional terms; (4) the group of people entitled to relief is too narrow; (5) the proportion of monetary relief awarded to Charging Parties is too small; (6) an improper distribution of the settlement fund is contemplated; and (7) the settlement terms are too vague to know the specific type and amount of relief the objector will receive.

## II.    STANDARD

It is well-established that voluntary compliance and affirmative change are the preferred means of achieving Title VII's objectives. *Local 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 515-16 (1986). As the Sixth Circuit noted, "in crafting Title VII, Congress chose 'cooperation and voluntary compliance … as the preferred means' for eradicating workplace discrimination." *Logan v. MGM Grand Detroit Casino*, 939 F.3d 824, 828 (6th Cir. 2019). Consistent with that principle, there is a presumption of validity when federal and state "governmental agencies ... worked toward and approve of the consent decree." *Kelley v. Thomas Solvent Co.*, 790 F. Supp. 731, 735 (W.D. Mich. 1991). In terms of this expectation of lawfulness, "settlement agreements negotiated by an agency of the federal government in an employment discrimination suit carry 'the presumption of validity that is overcome only if the decree contains provisions which are unreasonable, illegal, unconstitutional, or against public policy.'" *United States v. Par. of Orleans Crim. Sheriff*, Case No. 90-4930, 1997 WL 35215, at *5 (E.D. La. Jan. 27, 1997) (quoting *United States v. City of Alexandria*, 614 F.2d 1358, 1362 (5th Cir. 1980)). A district court may not approve a settlement until it determines, after a hearing, that "the settlement is fair, reasonable and adequate." *Int'l Union, United Auto., Aerospace, and Agric. Implement Workers of Am. v. Gen. Motors*

*Corp.*, 497 F.3d 615, 631 (6th Cir. 2007). Seven factors guide the district court's inquiry into the lawfulness, fairness, and adequacy of a proposed settlement: (1) the plaintiffs' likelihood of ultimate success on the merits balanced against the amount and form of relief offered in the settlement; (2) the complexity, expense and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the judgment of experienced trial counsel; (5) the nature of the negotiations; (6) the objections raised by class members; and (7) the public interest. *Reed v. Rhodes*, 869 F. Supp. 1274, 1279 (N.D. Ohio 1994) (citing *Williams v. Vukovich*, 720 F.2d 909, 921-23 (6th Cir. 1983)) (other citations omitted); *see also Int'l Union*, 497 F.3d at 631. The Sixth Circuit has been clear that the scope of the court's review of the settlement under these factors is not to "decide the merits of the case or resolve unsettled legal questions," but to ensure that the disputes are real and that the settlement fairly and reasonably resolves the parties' differences. *Int'l Union*, 497 F.3d at 631, 636-37. The district court's approval of a settlement agreement will not be disturbed on appeal absent an abuse of discretion. *Bailey v. Great Lakes Canning, Inc.*, 908 F.2d 38, 42 (6th Cir. 1990).

## III. ANALYSIS

To ensure the fairness of the Parties' Settlement Agreement, the Court must determine whether the settlement is "fair, reasonable, and adequate," guided by the seven factors discussed above. *Int'l Union*, 497 F.3d at 632.

### A. The Likelihood of Plaintiffs' Success on the Merits Balanced Against the Amount and Form of Relief Offered in the Settlement

In determining whether the relief offered in a settlement outweighs the Plaintiffs' chances of ultimate success on the merits, the Court "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs inherent in taking any litigation to completion." *IUE–CWA v. General Motors Corp.,* 238 F.R.D. 583, 594 (E.D. Mich. 2006). The Court "is not to decide whether one side is right or even whether one side has a better of these arguments.... The question rather is whether the parties are using settlement to resolve a legitimate legal and factual dispute." *Int'l Union,* 497 F.3d at 632.

The Court concludes that the Settlement Agreement proposed here seeks to resolve a genuine legal and factual dispute. The United States challenged two employment practices as violations of Title VII: (1) the designation of four Non-Housing CO assignments (Food Service, Yard, Property Room, and Electronic Monitor) at WHV as "female-only" positions, and (2) transfer practices that prevented female COs from transferring out of WHV on terms that were applicable

to male COs. (Amended Compl., PageID.35-40.) A facially discriminatory policy such as female-only designations requires Defendants to not only raise a BFOQ defense, but to actually prove that defense, which the Sixth Circuit has acknowledged to be a difficult hurdle. *See Everson v. Mich. Dep't of Corr.*, 391 F.3d 737, 748 (6th Cir. 2004). If Defendants cannot prove that being female is a BFOQ for the positions that the United States challenges, then they are liable for violating Title VII. 42 U.S.C. § 2000e-2(e)(1) (a sex qualification must be "reasonably necessary to the normal operation of that particular business or enterprise" to justify a facially discriminatory practice). Moreover, "an employer['s] fail[ure] to rebut … the Government's prima facie case … justifies an award of prospective relief," so Defendants' failure to establish a BFOQ would warrant injunctive relief. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 361 (1977). The United States further contends that MDOC's practice of barring only female COs from transferring constitutes an improper sex-based pattern or practice of disparate treatment because the "discrimination was the company's standard operating procedure[,] the regular rather than the unusual practice,' and the discrimination was directed at a class of victims." *United States v. City of New York*, 717 F.3d 72, 83 (2d Cir. 2013) (citations omitted) (alteration in original). (Amended Compl., PageID.44.)

Notwithstanding the strength of the United States' claims, the inherent risks of continued litigation weigh in favor of approving the Settlement Agreement, which also provides for more immediate significant monetary and injunctive relief. The United States asserts that, if the case had gone to trial, it would have sought money in the form of compensatory damages. Given the uncertainty and variability of compensatory damages, which would be decided by a jury, the Parties contend that the amount of monetary damages provided by the agreement constitutes a fair compromise, which comes after fact discovery and extensive settlement discussions. In addition, the systemic changes at WHV provided for in the Settlement Agreement are significant and highly likely to more immediately remedy the violations alleged in the Amended Complaint.

As the Sixth Circuit has noted: "A court may not withhold approval simply because the benefits accrued from the decree are not what a successful plaintiff would have received in a fully litigated case. A decree is a compromise which has been reached after the risks, expense, and delay of further litigation have been assessed." *Williams*, 720 F.2d at 922. This Court therefore finds the Settlement Agreement to be a fair compromise, which tailors the relief to address the employment practices challenged in the Amended Complaint, and that the balance

of the strengths of the United States' case against the relief awarded in the settlement weighs in favor of approving the Settlement Agreement.

## B. Complexity, Expense, and Likely Duration of the Litigation

"[T]he prospect of a trial necessarily involves the risk that Plaintiffs would obtain little or no recovery." *In Re Cardizem CD Antitrust Litig.,* 218 F.R.D. 508, 523 (E.D. Mich.2003). "Experience proves that, no matter how confident trial counsel may be, they cannot predict with 100% accuracy a jury's favorable verdict...." *Id.*

The Court recognizes that a pattern or practice case, such as this one, is involved and complex, as the litigation to date has shown. In recognition of that complexity, the Court ordered this case bifurcated into liability and damages phases, and the litigation phase was further separated into the litigation of the pattern-or-practice claims and then the individual discrimination claims. (ECF No. 13, Stip. & Order Regarding Bifurcation of Disc. & Trial.) The Parties engaged in significant fact and expert discovery and motion practice in the pattern-or-practice phase alone, with more anticipated for the individual disparate treatment claims. If the United States prevailed, an extensive remedial relief phase, including discovery and trial on each individual CO's entitlement to and scope of relief, would follow. The Court finds that the Parties were looking ahead to complex, expensive, and lengthy

litigation had this case not settled, and this factor weighs in favor of approval of the Settlement Agreement.

### C.     Stage of the Proceeding and the Amount of Discovery Completed

As discussed above, the proposed settlement comes after a great deal of discovery had been completed. The litigation had been going on over three years when the Parties agreed in principle to settle. Thousands of pages of documents had been exchanged, the United States had taken comprehensive 30(b)(6) depositions of the MDOC covering 28 topics and involving 13 different 30(b)(6) deponents. In addition, there were 14 fact witness depositions of MDOC officials and employees, and the United States had identified its expert and disclosed its expert report. The Parties obtained significant discovery and disclosure of key facts and information to weigh the evidence and negotiate a reasoned compromise. The Court finds that the discovery to date is assuredly sufficient "to permit the plaintiffs to make an informed evaluation of the merits of a possible settlement," and to permit this Court "to intelligently approve or disapprove the settlement." *UAW v. Ford Motor,* No. 07-14845, 2008 WL 4104329, at \*26-27 (E.D. Mich. Aug. 29, 2008).

### D.     Judgment of Experienced Trial Counsel

The Court finds that both Parties are represented by experienced counsel who have devoted extensive time and effort to pursuing this litigation and significant

discovery. Thus, the Parties negotiated this Settlement Agreement after significant litigation and with full knowledge of the relative strengths and weaknesses of their legal positions. In the absence of evidence of collusion (there is none here) this Court "should defer to the judgment of experienced counsel who has competently evaluated the strength of his proofs." *Williams,* 720 F.2d at 922-23. The Court concludes that this factor weighs heavily in favor of final approval of the Settlement Agreement.

### E.  Nature of the Negotiations

The United States and Defendants negotiated the settlement at arms' length over many months, including three mediation sessions before Magistrate Judge Majzoub. The Parties' good faith is supported by the fact that counsel for both sides are public servants acting in the public interest, and certainly "further evidenced by [a] 'manifested willingness ... to thoroughly consider all oral and written comments made with regard to the proposed decree'" by interested parties at the Fairness Hearing on the Terms of the Settlement Agreement. *United States v. Lexington-Fayette Urban Cnty. Gov't*, 591 F.3d 484, 489 (6th Cir. 2010) (quoting *United States v. Akzo Coatings of Am.*, 949 F.2d 1409, 1435 (6th Cir. 1991)). This factor thus weighs in favor of approval of the Settlement Agreement.

### F.     Public Interest

"In evaluating the public interest, the district court must consider whether the decree is 'consistent with the public objectives sought to be attained by Congress.'" *Lexington-Fayette Urban Cnty. Gov't*, 591 F.3d at 490 (quoting *Williams*, 720 F.2d at 923)). "[T]here is a strong public interest in encouraging settlement of complex litigation and class action suits because they are 'notoriously difficult and unpredictable' and settlement conserves judicial resources." *In re Cardizem,* 218 F.R.D. at 530.

There do not appear to the Court to be any countervailing public interests that would suggest that the Court should disapprove the Settlement Agreement. The Agreement here allocates monetary relief according to the amount of time that each CO worked at WHV, was eligible to transfer, and was harmed by the inability to transfer. Additionally, the Agreement provides for 15 priority transfers to allow a select group of Claimants to transfer out of WHV. Also, the Settlement Agreement provides for two public hearings to ensure the fairness of the Agreement, protect third parties' rights, and safeguard the Agreement from collateral attack. This first Fairness Hearing, held on June 2, 2021, prior to approval of the Agreement, gave affected third parties the opportunity to voice any objections to the terms of the Agreement and allowed this Court the opportunity to satisfy itself that the terms of

the Settlement Agreement are lawful, fair, reasonable, adequate, and otherwise consistent with the public interest. The second Fairness Hearing, which will be held prior to the implementation of the relief, will give this Court the chance to ensure that the awards of individual remedial relief are fair and equitable given the total amount of relief available under the Settlement Agreement. Accordingly, this factor weighs in favor of final approval of the Settlement Agreement.

### G.    Objections by Class Members

Following the notice and objection process described above, the Parties received 39 objections. Fifteen of those objectors requested to speak at the Fairness Hearing, and ten of those 15 objectors appeared and addressed the Court at the June 2, 2021 Fairness Hearing. The Parties contend that the objections generally fall within the following seven categories.

#### 1. Claimants other than Charging Parties should not receive individual relief

Two of the Charging Parties object that Claimants, other than the Charging Parties, should not be eligible for individual relief because they were not willing to take the risk of filing EEOC charges. (ECF Nos. 93-18, 93-29.) However, the Settlement Agreement does recognize the service by the Charging Parties in filing the EEOC charges that serve as the basis for this lawsuit, through service awards and

priority for the priority transfers, *in addition to* the monetary awards for the individual harm caused by the transfer freeze.

Further, the Amended Complaint shows that this is primarily a pattern-or-practice case, as every count in the Amended Complaint includes a pattern-or-practice allegation. (Amended Compl., PageID.40-44.) The EEOC charges in this matter themselves include class allegations on behalf of female COs working at WHV. (ECF No. 84-1, EEOC Charges, PageID.2146-55.) In addition, the Joint Discovery Plan and Stipulation and Order Regarding Bifurcation of Discovery and Trial, filed with and approved by the Court at the beginning of the case, specified that the pattern-or-practice claims would be tried first, and if the Court found liability on those claims, then the individual discrimination claims of the Charging Parties and similarly situated female COs "fall away and are analyzed under the same standard as their entitlement to individual remedial relief for the pattern-or-practice claims[.]" (ECF No. 13, Stipulated Order, PageID.105-06.) Only if the United States did not establish any pattern or practice would individual claims be tried. (*Id.*, PageID.106.)

The focus in a case of this type is to provide a remedy to the group as a whole and not just to specific individuals, as would be appropriate in a single-plaintiff case. *See International Brotherhood of Teamsters*, 431 U.S. at 364-65 (explaining where

a pattern or practice of discrimination has been shown, each member of the discriminated-against class is presumptively entitled to relief, but individual relief may be granted only on an individualized finding of discrimination). Indeed, an agency of the Federal Government that brings a lawsuit in the public interest, like the Department of Justice, is recognized by the courts as having a separate and different interest than an individual complainant in a Title VII lawsuit or private class action. As the Supreme Court expressed: "[T]he EEOC is not merely a proxy for the victims of discrimination and [...its] enforcement suits should not be considered representative actions subject to Rule 23." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 288 (2002) (quoting *Gen. Tel. Co. of the NW, Inc. v. EEOC,* 446 U.S. 318, 326 (1980)).

Here, in the manner contemplated by the Joint Discovery Plan and Stipulation, the Parties settled the pattern-or-practice claims, and are now going through an individual claims process through which the Potential Claimants are able to submit claims to recover their individual damages. Accordingly, the Court finds that it would not be appropriate for the Charging Parties only to be awarded individual relief, and these objections are overruled.

## 2.  The individual relief is insufficient

Several objectors contend that the amount of monetary relief agreed upon, after years of litigation, does not sufficiently compensate them for the harm they suffered. (ECF Nos. 93-1, 93-3, 93-5, 93-6, 93-8, 93-9, 93-14, 93-18, 93-21 to 93-25, 93-28 to 93-30, 93-33, 93-35, 93-37.) Two other objectors argue that the priority transfer relief is insufficient. (ECF Nos. 93-15 (arguing that "MDOC/WHV needs to have more than 15 transfers"); 93-28 (complaining that "[t]here is still not a guarantee that I will be able to transfer if the facility is not at its compliment [sic]").)

The Parties contend that the Court must look at the totality of relief provided by a Settlement in assessing whether to approve it. "[W]here monetary relief is but one form of the relief requested by the plaintiffs[,] [i]t is the *complete* package taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Schaefer v. Tannian*, No. 73-39943, 1995 WL 871134, at *7-8 (E.D. Mich. Apr. 17, 1995) (citing *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 628 (9th Cir. 1982)). In addition to the individual relief (monetary damages and priority transfers), the Parties have negotiated: (1) the development by MDOC of a Title VII-compliant system for reviewing female-only job assignments; (2) the lift of the WHV transfer freeze under specified conditions; and, (3) the implementation of a robust recruitment and

20

retention plan for WHV to help ensure there will be sufficient female staff in order not to reinstitute a transfer freeze at WHV. Thus, considering the Settlement Agreement as a whole, the Court finds that it is fair and provides substantial relief that cannot be monetized.

In addition, the monetary settlement provides for a damage award which is both significant to Defendants and meaningful to the Claimants. The relief was the result of a settlement reached after protracted litigation between two government entities, involving extensive discovery, and after extended arms-length settlement negotiations. The monetary amount thus was a matter of compromise reflecting an assessment by the Parties of the inherent risks of further litigation, through trial and possible appeals. *See Officers for Justice*, 688 F.2d at 628 ("Undoubtedly, the amount of the individual shares will be less than what some class members feel they deserve but, conversely, more than the defendants feel those individuals are entitled to. This is precisely the stuff from which negotiated settlements are made.").

Moreover, with regard to compensating for the transfer freeze, and the 15 priority transfers, the reality is that even if there had not been a transfer freeze, every Claimant would not have been able to transfer out of WHV. The Parties explain that there are a limited number of transfers available in each transfer cycle, and it is impossible to determine which COs would have been permitted to transfer in the

absence of discrimination. The Parties therefore properly negotiated class-wide relief. *See Bailey v. Great Lakes Canning, Inc.*, 908 F.2d 38, 42 (6th Cir. 1990) (approving *pro rata* distribution of an award among class members in a settlement of a discriminatory hiring case where "[i]t would have been virtually impossible for the court to determine which individuals would have been hired but for the discrimination ... even though it obviously may have generated a windfall for persons who would never have been hired and undercompensated the genuine victims of discrimination"). Therefore, these objections are overruled.

### 3. The injunctive relief should include additional terms

Several objectors propose injunctive relief which includes terms not currently in the Settlement Agreement. Specifically, two objectors argue that the settlement "[s]hould include both a minimal 20 year mandate on both 70% of all (bid & non bid) assignments being female and facilities not hiring more male staff than that dictates (excessive male staff kept females off custody assignments)." (ECF Nos. 93-16, 93-27.)

The Parties explain that the Settlement Agreement contains substantial injunctive relief carefully tailored to correct the Title VII violations alleged in the Amended Complaint. The Agreement provides a detailed process for the development of a system for reviewing female-only job assignments to ensure

compliance with Title VII (that "female sex is a BFOQ reasonably necessary to the normal operation of WHV"), as well as a robust recruitment plan for WHV focused on attracting female COs to work at WHV, and a retention plan to maintain sufficient numbers of female COs at WHV. On the other hand, the Parties contend that the terms suggested by the objectors – a 20-year mandate for 70% female-only assignments – is beyond the scope of the Amended Complaint and would not account for changing conditions at WHV. Title VII permits an assignment to be single-sex only under very specific circumstances, *see* 42 U.S.C. § 2000e-2(e)(1), and so a blanket mandate that 70% of WHV assignments be female-only cannot be justified. Because the Agreement provides for injunctive relief tailored to the allegations in the Amended Complaint, the objections are overruled.

### 4. The group of people entitled to relief is too narrow

The Parties received two objections challenging the Settlement Agreement because it limits individual relief to only female WHV COs and does not extend individual relief to other groups, such as male COs at WHV or female COs who worked at the Scott Correctional Facility prior to 2009. (ECF Nos. 93-7, 93-17.) As explained above, the Settlement Agreement is tailored to the allegations in the Amended Complaint, which alleged that *WHV's* policies harmed only female COs *at WHV*. The EEOC Charges contained similar allegations limited to female COs *at*

*WHV*. Accordingly, the objections at ECF Nos. 93-7 and 93-17 are rejected because they seek relief exceeding the scope of this lawsuit. Individuals other than female COs at WHV have not been alleged to have been harmed by Defendants' challenged employment practices. Relief is not appropriate for groups of individuals for whom relief was not sought in the complaint. *See EEOC v. Astra USA, Inc.*, No. CIV.A. 98-40014-NMG, 1999 WL 342043, at *3 (D. Mass. May 20, 1999) (approving Special Master's decision to deny relief under the Title VII consent decrees to would-be claimants whose allegations were not covered by the complaint in that case).

### 5. The proportion of monetary relief awarded to Charging Parties is too small

One objection complains that the proportion of monetary relief allotted to the Charging Parties is too small. (ECF No. 93-19.) Twenty percent of the $750,000 settlement fund is reserved for service awards to the 28 Charging Parties. (ECF No. 90-1, PageID.2233.) To recognize the Charging Parties' roles in filing the EEOC Charges and their assistance in this litigation, they will receive a service award of $5,000 or $10,000. (*Id.*) The Charging Parties are also eligible to apply for additional monetary relief related to the harm they experienced due to the inability to transfer out of WHV. (*Id.*)

The Court finds that the service awards in this case are reasonable and consistent with those awarded to Charging Parties in other cases. *See EEOC v. Wal-Mart Stores, Inc.*, No. 6:01-CV-339-KKC, 2011 WL 6400160, at *3 (E.D. Ky. Dec. 20, 2011) (approving service awards to class members who assisted in the litigation in the amounts of $3,500 to $13,500). The Sixth Circuit has cautioned that "applications for incentive awards are scrutinized carefully by the courts who sensibly fear that incentive awards may lead named plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain." *Hadix v. Johnson*, 322 F.3d 895, 897 (6th Cir. 2003). This Court, and others in this District, have "voiced concerns over 'incentive awards' to class representatives and have either refused, or at least reduced, such awards. *Garner Props. & Mgmt., LLC v. City of Inkster*, 333 F.R.D. 614, 628 (E.D. Mich. 2020) (collecting cases). In *Garner*, this Court found that "the proposed $10,000.00 incentive award is excessive because it is at least 100 times greater than what Plaintiff's fellow class members will recover," and thus awarded a reduced incentive award of $1,000.00. *Id.*

The Parties assert that at this time, "based on preliminary calculations and the *Interest-in-Relief Forms* that have been received by the Parties thus far, it appears that the average award to a Charging Party likely will be slightly more than three times the average award to a non-Charging-Party Claimant." (Joint Mot. at p. 21,

PageID.2347.) The Court finds that it would not be appropriate to adjust those negotiated service award amounts, which appear reasonable and to fairly compensate the Charging Parties for their efforts in this litigation, and to adequately incentivize others to serve as class representatives in similar cases. Accordingly, this objection is overruled.

### 6. An improper distribution of the settlement fund is contemplated

One objections asserts: "I think it should matter how many years [a Claimant worked] in the department and [there] should be tiers." (ECF No. 93-12.) The Parties explain that the Settlement Agreement already provides that monetary relief will be distributed based on a formula which includes, as a key component, the amount of time that a Claimant has worked at WHV during which she was eligible to transfer. (ECF No. 90-1, PageID.2256.) Thus, this objection is seeking terms already contained the Settlement Agreement, and accordingly is overruled.

### 7. The settlement terms are too vague to know the specific type and amount of relief the objector will receive

One objection complains that the Claimants lacked sufficient information about the Settlement Agreement because the exact class size is unknown and thus its impact on the Individual Awards is unknown. (ECF No. 93-1.) Another objection claims that "[t]he terms of the settlement is [sic] too vague and is not clear to what I'm being asked to agree." (ECF No. 93-6.)

26

To the extent these objections complain that the objectors do not know specifically what and how much individual relief each Claimant will be entitled to, the Settlement Agreement describes both how Claimants' eligibility will be evaluated, as well as how the monetary relief and priority transfers will be distributed among eligible Claimants. (ECF No. 90-1, PageID.2245-46, 2262-63.) These provisions were further summarized for the Claimants in the Notice Documents. (*Id.* PageID.2275-76.) Further, all Claimants will have an opportunity to object once they know what their Individual Awards will be, and a second Fairness Hearing on Individual Awards will be held after the Claimants are notified and have an opportunity to object. (*Id.* PageID.2251-55.) Accordingly, these objections are overruled.[2]

---

[2] The Parties received five blank objections that do not provide any basis for objecting to the Settlement Agreement, (ECF Nos. 93-4, 93-10, 93-11, 93-13. 93-26), which are rejected for that reason. There are also two objections unrelated to the claims at issue in this lawsuit. (ECF Nos. 93-15 (complaining about seepage of sewage into dining halls and an assault by an inmate), 93-33 (complaining of "unconscious or implicit bias" as "a major contributor to a lack of workplace diversity [at WHV].").) These claims cannot be addressed by this Settlement Agreement and are rejected. Finally, to the extent any of the objections simply assert that they were harmed by their inability to transfer out of WHV, but did not contest any terms of the Agreement (ECF Nos. 93-2, 93-20, 93-31, 93-32, 93-34), these Potential Claimants have received *Interest-in-Relief Forms*, and have had an opportunity to submit them to make a claim.

Finally, at the June 2, 2021 Fairness Hearing, ten objectors appeared and addressed the Court regarding their objections to the proposed Settlement Agreement and their concerns regarding their treatment by the MDOC. The objectors described the serious impact the Defendants' discriminatory employment practices at WHV have had on them, their careers, and their personal lives, including the detrimental impact on their families, their mental health and their physical health. Many objectors described being constantly denied an opportunity to transfer from WHV pursuant to the MDOC's transfer process and the severe professional and personal hardships they endured as a result. One objector testified to being told she could not transfer because she did not have "the correct body parts." The objectors stated that the MDOC was simply not responsive to their legitimate requests and complaints about the harmful and discriminatory policies at MDOC. The Court well notes the significant impact on their lives, but concludes that this settlement will remedy the situations described in the Amended Complaint.

## IV.    CONCLUSION

Upon consideration of all of the above, and having conducted an extensive Fairness Hearing on the Terms of the Settlement Agreement on June 2, 2021, the Court **GRANTS** the Plaintiff United States of America and Defendants State of Michigan and Michigan Department of Corrections' Joint Motion for Final Approval

of the Settlement Agreement and Responses to Objections (ECF No. 93.) The Court **REJECTS** the objections to the Settlement Agreement filed with the Court.

The Court further concludes that the Settlement Agreement is lawful, fair, reasonable, and consistent with the public interest, and Settlement Agreement (ECF No. 90-1) therefore is **APPROVED AND ENTERED**.

Finally, the Court commends the Plaintiff United States in recognizing the issues at WHV and bringing this lawsuit to put an end to the discriminatory practices against the female correctional officers at WHV, and in working diligently with Defendants, who have ultimately cooperated to remedy those problems.

IT IS SO ORDERED.

s/Paul D. Borman
Dated: June 3, 2021                          Paul D. Borman
                                             United States District Judge